# United States Court of Appeals
## For the First Circuit

Vol. II of II

No. 01-1619

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM SOTO-BENÍQUEZ,

Defendant, Appellant.

No. 01-1674

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN SOTO-RAMÍREZ,

Defendant, Appellant.

No. 00-1547

UNITED STATES OF AMERICA,

Appellee,

v.

EDUARDO ALICEA-TORRES,

Defendant, Appellant.

No. 01-1620

UNITED STATES OF AMERICA,

Appellee,

v.

RAMON FERNÁNDEZ-MALAVÉ,

Defendant, Appellant.

_____

No. 00-1464

UNITED STATES OF AMERICA,

Appellee,

v.

CARMELO VEGA-PACHECO,

Defendant, Appellant.

_____

No. 00-1488

UNITED STATES OF AMERICA,

Appellee,

v.

ARMANDO GARCÍA-GARCÍA,

Defendant, Appellant.

_____

No. 00-1470

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE LUIS DE LEÓN MAYSONET,

Defendant, Appellant.

_____

No. 00-1362

UNITED STATES OF AMERICA,

Appellee,

v.

RENE GONZALEZ-AYALA,

Defendant, Appellant.

_____

No. 00-1543

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN ENRIQUE CINTRÓN-CARABALLO,

Defendant, Appellant.

_____

No. 00-1361

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL VEGA-COLÓN,

Defendant, Appellant.

—————————————

No. 00-1456

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL VEGA-COSME,

Defendant, Appellant.

—————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Daniel R. Domínguez, U.S. District Judge]

—————————————

Before

Selya, <u>Circuit Judge</u>,
Coffin, <u>Senior Circuit Judge</u>,
and Lynch, <u>Circuit Judge</u>.

—————————————

<u>Marlene Apontes-Cabrera</u> for appellant Soto-Beníquez.
<u>Miriam Ramos-Grateroles</u> for appellant Soto-Ramírez.
<u>Raymond Rivera Esteves</u> for appellant Alicea-Torres.
<u>Luz M. Rios-Rosario</u> for appellant Fernández-Malavé.
<u>Javier Morales-Ramos</u> for appellant Vega-Pacheco.
<u>Rachel Brill</u> for appellant García-García.
<u>Roberto Roldan-Burgos</u> for appellant de León Maysonet.
<u>Victor Miranda-Corrada</u>, for appellant Gonzalez-Ayala.
<u>Rafael Anglada-Lopez</u> for appellant Cintrón-Caraballo.
<u>Marcia G. Shein</u> for appellants Vega-Cosme and Vega-Colón.

Jacabed Rodriguez-Coss and Michelle Morales, Assistant United States Attorneys, with whom H.S. Garcia, United States Attorney, and Sonia I. Torres-Pabon, Assistant United States Attorney, were on brief, for appellee.

———————————————

November 20, 2003

———————————————

f)    Improper Admission of Rule 702 Expert Testimony As
      Lay Testimony Under Rule 701
      (Cintrón-Caraballo)

Cintrón-Caraballo argues that the court should have excluded the testimony of eleven witnesses because they provided expert testimony but, he says, were not disclosed as experts under Rule 702.[8]  These witnesses included eight forensic examiners (Ruben Diaz-De Leon, Alfredo Roman-Rodriguez, Virginia Cortes, Luis Batista-Maldonado, Nelson Morales-Huerta, Luis Mercedes-Rodriguez, Francisco Ramos-Seda, and Cesar W. Ostolaza-Perez), two pathologists (Dr. Yocasta Brougal-Mena and Dr. Francisco Cortes), and a firearms examiner (Juan B. Maldonado).  This was prejudicial, Cintrón-Caraballo argues, because the defendants would have been entitled to summaries of the witnesses' testimony if they had been designated as experts.  See Fed. R. Crim. P. 16(a)(1)(G)(defendants are entitled to summaries of all expert testimony, which must include "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications").

The district court correctly determined that none of the eight forensic examiners provided expert testimony.  Witnesses who testify only about their perceptions of an event, or about lay opinions arising out of those perceptions, see Fed R. Evid. 701,

_____

[8]    The trial in this case took place in 1999, before the December 1, 2000 effective date of the amendments to Rules 701 and 702.  Accordingly, we apply the pre-amendment Rules and case law.

are not experts under Rule 702 regardless of any specialized training or experience they may possess. See United States v. Paiva, 892 F.2d 148, 157 (1st Cir. 1989) ("[T]he individual experience and knowledge of a lay witness may establish his or her competence, without qualification as an expert, to express an opinion on a particular subject outside the realm of common knowledge."); see also United States v. Rivera-Santiago, 107 F.3d 960, 968 (1st Cir. 1997). That rule is dispositive here: the court permitted each of the witnesses to testify only about their observations at the various crime scenes they personally investigated. Indeed, the court consistently reminded both the witnesses and the lawyers that if any of these witnesses' testimony "sound[ed] like a 702 [opinion] . . . [he would] not admit it." Although at points the district court faced difficult decisions about the side of the Rule 701 / Rule 702 divide on which a witness's opinion fell, there was no abuse of discretion in the court's resolution of these issues. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) (review of a district court's decision to admit or exclude expert testimony is for abuse of discretion).

Nor did the district court abuse its discretion in allowing the expert testimony of the two pathologists, Drs. Cortes and Brugel-Mena. The district court found, despite the government's failure to label the witnesses' testimony and reports

as Rule 702 material in its pre-trial disclosure, that the government had effectively complied with the applicable disclosure requirements. In particular, the government had informed defendants before trial that both pathologists would be testifying about several autopsies and provided the defendants with copies of all of these autopsy reports. Although Dr. Cortes testified about one autopsy report that he did not personally prepare, the district court permitted this substitution because the pathologist who had prepared that report was unavailable to testify due to serious illness. There is no generalized prohibition on allowing experts to testify about autopsy reports that they did not personally prepare. See Manocchio v. Moran, 919 F.2d 770, 780 (1st Cir. 1990).

The government failed to formally designate the last witness, Juan Maldonado, as an "expert", but it did inform the defendants that Maldonado would be testifying about ballistics and provided the defense with all of Maldonado's notes on his testimony. And once again, the district court permitted Maldonado's testimony due to the lack of prejudice to the defense. Here, though, the court compensated the defendants for the government's failure to adhere to the technical requirements of Fed. R. Crim. P. 16 by certifying the witness only as a ballistics expert, and refusing to also certify him as a "firearms expert." This decision was an appropriate sanction against the government

and undercuts the defendant's prejudice argument.

> g)   Rule 404(b) "Bad Act" Evidence
>      (Cintrón-Caraballo)

Cintrón-Caraballo argues that the court erred in admitting evidence of his March 8, 1994 arrest by Puerto Rico police, and of the contemporaneous seizure of a gun that he was carrying.  He argues that this evidence was impermissible bad act evidence under Fed. R. Evid. 404(b) because it was not relevant to demonstrating his participation in the conspiracy, which, according to the indictment, had ended one day earlier, on March 7.  Cintrón-Caraballo also argues that the firearms evidence should have been excluded as unreliable because the firearm had been destroyed by Puerto Rico authorities.

These arguments are unavailing.  Evidence of Cintrón-Caraballo's arrest was admissible under Rule 404(b) because the arrest was for activities evidencing his participation in the conspiracy charged in the indictment.  The arrest took place on Street B, where the drug point that the government alleged Cintrón-Caraballo supervised was located.  This evidence demonstrated an overt act in furtherance of the alleged conspiracy and Rule 404(b) explicitly provides that evidence of bad acts is admissible for purposes other than showing actions in conformity with those acts. See Fed. R. Evid. 404(b).

The fact that the indictment charged the conspiracy with ending "on or about" March 7 does not change this conclusion.  The

"on or about" language left the district court leeway to conclude that the arrest fit within this time frame, and thus that the arrest was evidence of an act directly in furtherance of the conspiracy.  Cf. Portela, 167 F.3d at 704 (indictment charging defendant with possession of cocaine "on or about" March 1995 provided "perfectly adequate" notice to the defendant for acts charged in April 1995).

We also reject Cintrón-Caraballo's related objection that the photograph of the gun should have been excluded because there was no reliable evidence that it was the gun actually seized from him.  The district court found that there were sufficient indicia of reliability that the photograph was what it purported to be because specific markings on the gun in the photograph matched the description in the police report.  The arresting officer also testified that the photograph depicted the weapon seized from Cintrón-Caraballo.  Under these circumstances, the photograph was properly authenticated.  See Fed. R. Evid. 901(a).

h)    Admission of Evidence on Rebuttal
(Soto-Ramírez)

In the government's case-in-chief, Negrón-Maldonado testified that Soto-Ramírez was involved in the murder of a government informant, Ana Luz Dones-Arroyo. Soto-Ramírez countered this testimony by suggesting that the government did not have sufficient evidence to indict him for Dones-Arroyo's murder because it had accepted his guilty plea to the charge of accessory after

the fact.  In rebuttal, the government called Juan Maldonado, who had previously testified as a ballistics expert, but whom the court had refused to further qualify as a firearms expert.  Maldonado testified that the same weapon that was used to kill Robles-Rodríguez -- a murder to which Soto-Ramírez had pled guilty -- was also used in the murder of Dones-Arroyo.

Defendant argues that Maldonado's testimony was not admissible as rebuttal evidence because Soto-Ramírez's argument that he only pled guilty to the accessory after the fact charge was not "a sweeping denial" of his involvement in the Dones-Arroyo murder.  We review the admission of rebuttal evidence for abuse of discretion.  See United States v. Leon-Delfis, 203 F.3d 103, 113 (1st Cir. 2000); Faigin v. Kelly, 184 F.3d 67, 85 (1st Cir. 1999).

The district court did not abuse its discretion in rejecting Soto-Ramírez's argument and admitting Maldonado's testimony as rebuttal evidence.  "Rebuttal evidence may be introduced to explain, repel, contradict or disprove an adversary's proof." United States v. Laboy, 909 F.2d 581, 588 (1st Cir. 1990). That is exactly what the government did here.  The defense opened the door to Maldonado's testimony when it attempted to demonstrate that Soto-Ramírez was only an accessory after the fact because that claim implied that Soto-Ramírez was not guilty of the underlying murder.

Soto-Ramírez also argues that Maldonado's testimony in

rebuttal should have been excluded because it was expert firearms testimony that the district court had specifically excluded during the government's case-in-chief. The court rejected this argument, concluding that the defendants had sufficient notice that Maldonado would testify to this issue and thus that its previous holding limiting Maldonado's testimony to ballistics was not applicable. This conclusion was sound. The defendants were provided with a report before trial that Maldonado would testify that the same weapons were used in the Robles-Rodríguez and Dones-Arroyo murders.

2. _Brady_ and _Giglio_ Claims
      (Soto-Beníquez, Soto-Ramírez, Alicea-Torres)

Defendants contend that there were multiple _Brady_ and _Giglio_ violations. See _Brady_ v. _Maryland_, 373 U.S. 83, 87 (1963); _Giglio_ v. _United States_, 405 U.S. 150, 153-54 (1972). First, several defendants challenge the government's failure to reveal the apparent inconsistencies in Rodríguez-López's story when it first became aware of them in the summer of 1998. At that time, all the prosecution knew was that Rodríguez-López had lied to the FBI (not the grand jury) about being present at Rivera-González's murder. He had not testified to the grand jury about that murder. Although the prosecution must reveal material information that is favorable to the accused, the fact that Rodríguez-López may not have been present at the Rivera-González murder is not exculpatory evidence. Admittedly, the analysis might have been different if the government had ultimately called Rodríguez-López as a witness at

trial: his earlier lies to the government would certainly have constituted a basis for impeaching him.  See Giglio, 405 U.S. at 153-54; Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003).  But the government did not call Rodríguez-López.  Furthermore, as the trial court noted, the defendants knew a month before trial that Rodríguez-López had lied, so they had sufficient time to interview him and have him testify if they so desired.

Several defendants also argue that the government failed to fully disclose the extent of Negrón-Maldonado's plea and cooperation agreement with the government.  After testifying on direct examination about ten murders, Negrón-Maldonado admitted during redirect examination that the government had promised him favorable treatment in his related state court proceedings in exchange for his testimony.  Counsel for Soto-Beníquez and Soto-Ramírez immediately moved for a mistrial, telling the court that the prosecution had never disclosed its intervention in the Puerto Rico courts on behalf of the witness.  (The prosecution had disclosed the existence of a plea arrangement between itself and Negrón-Maldonado).  At side-bar, the  government explained that while the Commonwealth of Puerto Rico had made certain oral assurances to the witness at the prosecution's behest, no agreement had been reduced to writing and thus there was no document that could have been produced to inform the defense of the agreement.

The  government's  obligation  to  disclose  impeachment

evidence is not, as suggested by the prosecution, dependent on whether that evidence has been reduced to written form.  See Giglio, 405 U.S. 152, 154-55 (reversing conviction where an oral agreement between a prosecutor and key witness was not disclosed to the defense).  Here, the government failed to disclose the full extent of its agreement with the witness until the defense uncovered the details of the arrangement during cross-examination.

Nonetheless, the defendants were not prejudiced by the government's delay in revealing this information and are not entitled to reversal on appeal.  See United States v. Lemmerer, 277 F.3d 579, 588 (1st Cir. 2002) (a  defendant must show that "learning the information altered the subsequent defense strategy," and that given timely disclosure, "a more effective strategy would likely have resulted" (quoting United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990)); United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986) (same).  Negrón-Maldonado admitted the full extent of his arrangement with the government during cross-examination. Moreover, the defendants' strategy in cross-examining Negrón-Maldonado was surely not impacted by the government's delayed disclosure.  Even without knowing about the federal prosecution's intervention in state court, the defense's cross-examination of Negrón-Maldonado was intended to suggest that the witness was fabricating his testimony in order to receive favorable treatment.  There has been no showing that having a larger quantum

of evidence than originally supposed would have altered the way in which the defense cross-examined the witness, and the court granted additional time to defense counsel to prepare and investigate the new information before cross-examination of the witness resumed. Again, we do not approve of the prosecution's conduct; we hold only that it does not provide a basis for reversal.

Soto-Beníquez and Soto-Ramírez also allege that the prosecution failed to disclose that it had granted immunity to Janet Garcia-Diaz, the girlfriend of Torrens-Alicea, another cooperating witness. This argument is without merit. Garcia-Diaz was told that she would not be prosecuted after she specifically inquired of the government whether she needed a lawyer, on the same day that she was called as a defense witness by Vega-Colón to impeach Torrens-Alicea's testimony for the prosecution. There was a window of, at most, several hours between the government's statement to Garcia-Diaz and the defendants' discovery of this supposed grant of immunity. Even assuming that the defendants were entitled to this information under Giglio, they became aware of the so-called "grant of immunity" on the same day that it was extended. No prejudice has been shown.

Finally, Soto-Beníquez and Soto-Ramírez suggest that the prosecution did not disclose the fact that cooperating witnesses were allowed to make unmonitored phone calls, visit with their spouses, and take pictures of themselves "half-naked" in government

offices.  Defendants, though, were informed by discovery letter about several visits by family members to cooperating witnesses. In any case, these benefits pale in comparison with the deals negotiated in the plea bargains.  Defendants were well aware of the agreements with cooperating witnesses (absent that of Negron-Maldonado, discussed above) and used them well in cross-examination.  There was no prejudice to the defendants.

3.___Closing Arguments
(de León Maysonet, Gonzalez-Ayala, García-García)

Several defendants urge that the prosecution's closing argument led to reversible error.

> In its rebuttal in closing the prosecutor argued:
> And one point that I want to make clear as to Ramon Fernandez Malave, as to Carmelo Vega Pacheco, as to Rene Gonzalez Ayala, as to Jose Luis de Leon Maisonet and anyone else who argues here before you that they are here before you pleading not guilty, pleading their innocence. Well, let me tell you something, ladies and gentlemen of the jury, **a plea of not guilty is not, not a declaration of innocence.  A plea of not guilty simply means, government, prove your case.  But a plea of not guilty is not a declaration of innocence.**

(emphasis added).  Defense counsel objected:

> We would like to interpose an objection, hinges on the constitution right to the presumption of innocence.

The court replied, in the presence of the jury:

> **There is a presumption of innocence going on.**  Fine.

(emphasis added).  The prosecutor echoed that:

> There is a presumption of innocence.  They are to be

-73-

presumed innocent, that is not what I'm arguing against, Your Honor. And I understand the jurisprudence from the First Circuit supports my argument.

The court then said:

Keep on going.

Later, the prosecution made a similar statement:

Carmelo Vega Pacheco again comes before you and says my client is pleading not guilty. **Again, a plea of not guilty is not a declaration of innocence**. It simply puts the government to its proof. And he argues, yes, he participated in [the] Quintana massacre but that was in furtherance of a different conspiracy.

(emphasis added). The defense again objected to this later statement, but not on the ground asserted on appeal -- namely, that the prosecutor's comments undercut the presumption of innocence.

Because a contemporaneous objection was made by defense counsel to the earlier statement, we review de novo the question of whether the argument was improper and review for abuse of discretion the court's ruling on whether the misconduct, if any, warrants a new trial. United States v. Hernandez, 218 F.3d 58, 68 (1st Cir. 2000). We conclude that error occurred but that it does not warrant a new trial.

On appeal, the prosecution argues that these statements were an accurate description of the law. It also contends that its comments were invited by the improper argument of several defendants that their pleas of not guilty in this case were reliable indications of their innocence because if they were guilty they would have admitted it in this case, as they did in the state

-74-

court.

The prosecution is wrong on both points. First, the prosecutor's comments did undermine the presumption of innocence. By saying that a plea of not guilty is "not a declaration of innocence" but simply means "government, prove your case," the prosecutor undercut the axiomatic principle that a defendant is presumed innocent until proven guilty and need not declare or prove that he is innocent. Regardless of the complex relationship between the presumption of innocence and the prosecution's duty to convince the jury beyond a reasonable doubt, see, e.g., Taylor v. Kentucky, 436 U.S. 478, 483-85 (1978) (noting the scholarly debate concerning whether the presumption of innocence is analytically distinct from the requirement that the government prove guilt beyond a reasonable doubt); McCormick on Evidence § 346 (5th ed. 1999) (suggesting that the presumption of innocence is "a convenient introduction to the statement of the burdens upon the prosecution"), due process requires that both of these principles guide the jury in reaching its verdict. Taylor, 436 U.S. at 483-86; Coffin v. United States, 156 U.S. 432, 453, 461 (1895). To undercut one, even if the other remains standing, is improper. It is for precisely this reason that a district court's failure to instruct the jury on the presumption of innocence may violate due process even when the jury has been properly informed of the prosecution's burden of proving guilt beyond a reasonable doubt.

-75-

<u>Taylor</u>, 436 U.S. at 488-89.

The prosecution's contention that the statements were a justified response to the argument of defense counsel is also incorrect. Although it is true that, in certain circumstances, a prosecutor's otherwise impermissible statements during closing argument may be allowable because they were "invited" by defense counsel, <u>United States</u> v. <u>Henderson</u>, 320 F.3d 92, 107 (1st Cir. 2003), this was clearly not such a case. Defense counsel's argument that the defendants' pleas of not guilty in federal court were particularly trustworthy because the defendants had formerly pled guilty in state court was not improper and did not justify the prosecutor's response.

Not every prosecutorial error in making closing argument justifies a new trial, even when that error undermines constitutional rights. No reversible error occurs when the reviewing court determines beyond a reasonable doubt that the constitutional error was harmless. <u>Wihbey</u>, 75 F.3d at 772 n.6; <u>see also</u> <u>United States</u> v. <u>Hasting</u>, 461 U.S. 499, 510-11 (1983). As the Supreme Court has clarified, the relevant question "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." <u>Sullivan</u> v. <u>Louisiana</u>, 508 U.S. 275, 279 (1993); <u>see</u> <u>United States</u> v. <u>Rivera-Santiago</u>, 107 F.3d 960, 967 (1st Cir. 1997).

We conclude beyond a reasonable doubt that the prosecutor's improper closing argument did not prejudice the defendants in this case. The court gave curative instructions that established the presumption of innocence immediately after the prosecutor's first improper statement (the only time the defense made the appropriate objection). It then reinforced the presumption in its general instructions to the jury, noting that it "is a cardinal principle of our system that every person accused of a crime is presumed to be innocent unless and until his/her guilt is established beyond a reasonable doubt." Given those instructions and the strong evidence of guilt, we conclude beyond a reasonable doubt that the statements did not affect the ultimate outcome of the case, especially when they occupied only several seconds in a six-month long trial.

4.    Cumulative Effect of Errors
      (Soto-Beníquez, Soto-Ramírez)

A series of errors, each one of which is individually "harmless," may have a cumulative effect that requires a new trial. United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).

Defendants rely on this proposition, arguing that, considered as a whole, the prosecution's missteps warrant a new trial. To this point, we have concluded that the prosecution erred in repeatedly failing to meet discovery deadlines, in neglecting to disclose the extent of its plea arrangement with Negrón-Maldonado, and in making inappropriate remarks during closing arguments. This

conduct is blameworthy and the government should take steps to see that it does not recur.

Still, the government's bad behavior does not require that the jury's verdict of guilt be set aside.  At a minimum, to overturn a verdict, the prosecution's bad behavior must have prejudiced the defendants.  See, e.g., United States v. Joyner, 191 F.3d 47, 53 (1st Cir. 1999) (in evaluating allegations of prosecutorial misconduct, "the unavoidable bottom line" is "whether we deem it likely, or not, that any prejudice affected the outcome of the case").  Although the frustrations of defense counsel are understandable, that test is not met here.

The defense was not demonstrably prejudiced by any of the government's violations, and sometimes even gained an advantage from them.  The defendants ultimately received the necessary discovery and were provided with compensation such as additional discovery and the exclusion of otherwise admissible evidence.  When the defendants learned of the federal prosecution's intervention in state court on behalf of Negrón-Maldonado, the court offered them additional time to cross-examine the witness.  And while the court's curative instruction during the prosecutor's closing arguments was concise, it was sufficient in the context of the overall instructions to assure that the jury was properly appraised of the import of the presumption of innocence.  The totality of errors argument is unsuccessful.

## D.  Post-Trial

### 1.  Sufficiency of Evidence as to CCE Count (Soto-Beníquez, Soto-Ramírez)

Soto-Beníquez and Soto-Ramírez argue that there is insufficient evidence to support their convictions.  They offer no further explanation, except to cite to their filings before the district court.  Their argument as to sufficiency of evidence has been waived.  See Grella, 42 F.3d at 36.  "If counsel desires our consideration of a particular argument, the argument must appear within the four corners of the brief filed in this court." Executive Leasing Corp. v. Banco Popular de P.R., 48 F.3d 66, 67-68 (1st Cir. 1995).  Attorneys cannot circumvent this requirement by referencing their district court filings.  Id. at 68.

### 2.  Sufficiency of Evidence as to Conspiracy Count (Cintrón-Caraballo, Vega-Cosme, Vega-Colón)

Vega-Cosme and Vega-Colón argue that the evidence is insufficient to tie them to the charged conspiracy. We reject this claim.

The government presented overwhelming evidence of Vega-Cosme's participation in the conspiracy.  Government witnesses testified that Vega-Cosme had a series of agreements with other members of the conspiracy to maximize drug revenue.  He negotiated with the Chacho gang on behalf of the drug points to end the warfare that was interfering with drug sales, met with Negrón-Maldonado to coordinate the colors of crack capsule caps to avoid

competition between the points, and arranged the opening of his own drug point on Laguna Street with Soto-Ramírez. Although Vega-Cosme correctly notes that there is no evidence that Soto-Ramírez acted as his supplier, the government did present testimony that Vega-Cosme supplied narcotics to Soto-Ramírez, along with ammunition used in shootings of rival gang members in 1992 and 1993.

The record also shows sufficient evidence of the participation of Vega-Cosme's son, Miguel Vega-Colón. Vega-Colón packaged crack cocaine, heroin, and marijuana for his father's point. He also stood armed guard at the Callejón Nueve drug point, which was owned by Rodríguez-López. Both of those activities were in furtherance of the conspiracy. Moreover, based on Vega-Colón's presence at meetings between Vega-Cosme and Soto-Ramírez, a reasonable jury could have concluded that he joined the conspiracy knowingly and voluntarily.

Vega-Cosme and Vega-Colón also argue that their convictions are based on unreliable testimony from co-conspirators who "had clear incentives to testify untruthfully." In assessing the sufficiency of evidence, credibility determinations must be resolved in favor of the verdict. United States v. Guerra-Garcia, 336 F.3d 19, 22 (1st Cir. 2003). Credibility judgments are the province of the jury, not of this court.

Cintrón-Caraballo also makes an insufficiency of evidence argument. He argues that the district court erred in admitting

certain expert testimony and Rule 404(b) "bad act" evidence, and contends that without this evidence, the only evidence tying him to the conspiracy is the uncorroborated testimony of co-conspirators. This argument fails. The contested evidence was properly admitted. See Part III.B(f)-(g). Moreover, even if Cintrón-Caraballo's conviction rested only on co-conspirator testimony, the jury was entitled to credit such testimony and convict him on that basis. See United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir. 2000).

3. Special Verdict and Jury Instructions for CCE Count (Soto-Beníquez, Soto-Ramírez)

Soto-Beníquez and Soto-Ramírez claim that the district court committed reversible error when it failed to instruct the jury to determine the quantity and type of drugs. First, they argue that the drug amount is an element of the CCE offense and that the jury was not otherwise instructed to find a minimum drug amount. Second, they argue that Apprendi v. New Jersey, 530 U.S. 466 (2000), requires that the drug amount be proven to the jury beyond a reasonable doubt. The standard of review for alleged jury instruction errors involving the interpretation of the elements of a statutory offense is de novo. United States v. Shea, 150 F.3d 44, 49-50 (1st Cir. 1998).

We reject both arguments. As to the claim that the drug amount is an element of the CCE offense, the CCE statute plainly does not require a minimum drug amount for a conviction.

-81-

As to Soto-Ramírez and Soto-Beníquez's <u>Apprendi</u> argument,

<u>Apprendi</u> requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Here, absent a finding of drug quantity, the statutory maximum for CCE is already life imprisonment: the statute authorizes a sentence of twenty years to life imprisonment regardless of drug amount. 21 U.S.C. § 848(a)-(c). A drug amount above a certain level can result in a mandatory life sentence, § 848(b), but does not change the statutory maximum. Hence, no <u>Apprendi</u> violation has occurred with regard to the CCE convictions.[9]

### 4. Special Verdict for Conspiracy Count (Alicea-Torres, Fernández-Malavé)

Alicea-Torres and Fernández-Malavé argue that the trial court erred in not providing the jury with a special verdict form requiring it to determine the quantity and type of drugs as to each defendant. They argue that a special verdict form was necessary to

---

[9] Soto-Beníquez and Soto-Ramírez also argue reversible error based on the district court's denial of their request for a special verdict sheet requiring the jury to find the type and amount of drugs as to each defendant. In criminal cases, the failure to use a special verdict form is reviewed for abuse of discretion. <u>United States</u> v. <u>Ellis</u>, 168 F.3d 558, 562 (1st Cir. 1999). For the reasons discussed above, we find no such abuse here. It was not necessary for the jury to determine the quantity or type of drugs to convict Soto-Ramírez and Soto-Beníquez on the CCE count.

ensure that the jury was unanimous as to drug type and quantity. This argument is based on <u>Apprendi</u> and is discussed later.

## E.  Sentencing

### 1.  <u>Apprendi</u> and Related Issues

#### a)  <u>Apprendi</u> Error
(Alicea-Torres, Fernández-Malavé, Vega-Pacheco, Vega-Cosme, Vega-Colón)

Five of the non-CCE defendants -- Alicea-Torres, Fernández-Malavé, Vega-Pacheco, Vega-Cosme, and Vega-Colón -- assert that their sentences violated the rule of <u>Apprendi</u>.  They argue that the amount of drugs distributed by the conspiracy was not proven beyond a reasonable doubt to a jury, that the drug amount raised the statutory maximum, and that their sentences must be vacated as a result.  We conclude that <u>Apprendi</u> error did occur, but that the error was harmless.

The jury instructions in this case did not make direct reference to drug amount or quantity.  Instead, the jury was instructed that, to find the defendants guilty of the conspiracy count, it had to find that the government proved the conspiracy charged in the indictment beyond a reasonable doubt.  The jury was provided with a copy of the indictment, which charged the defendants with knowingly and intentionally distributing more than five kilograms of heroin, more than five kilograms of cocaine, more than five kilograms of crack cocaine, <u>and</u> more than 100 kilograms of marijuana.  However, the jury was also instructed that the

actual amount of drugs need not be proven, and that the government need only prove that defendants distributed or possessed with intent to distribute a "measurable amount" of drugs.

The latter part of these instructions resulted in _Apprendi_ error. This case presents an even stronger case of _Apprendi_ error than United States v. Nelson-Rodriguez, 319 F.3d 12 (1st Cir. 2003). In that case, as here, the jury was given a copy of the indictment and instructed that to find the defendants guilty on the conspiracy count, it had to find them guilty of the conspiracy in the indictment. Id. at 45. The indictment in Nelson-Rodriguez, as here, specified drug types and quantities sufficient to support the defendants' sentences. Id. We concluded that this instruction was insufficient to elicit a jury determination of the threshold drug amount and quantity. Id. The same analysis applies here with greater force because the jury was specifically instructed that it need only find a "measurable amount" of drugs.

All five defendants who raise the _Apprendi_ issue were sentenced above the default statutory maximum. Absent a jury determination of drug amount or type, the default statutory maximum is based on the distribution of unspecified amounts of marijuana, which results in a maximum sentence of five years for first-time felony drug convictions and ten years if a prior such conviction exists. 21 U.S.C. §§ 841(b)(1)(D), 846. Alicea-Torres, Fernández-

Malavé, Vega-Pacheco, and Vega-Cosme were sentenced to life imprisonment, and Vega-Colón was sentenced to 292 months, or about twenty-five years, of imprisonment.

The existence of an Apprendi error, however, does not end the inquiry. If the defendants failed to preserve their Apprendi objection below, their sentences are vacated only if we find plain error. United States v. Cotton, 535 U.S. 625, 631 (2002). If they did preserve their objection, their sentences are vacated only if we find that the error was not harmless beyond a reasonable doubt. Nelson-Rodriguez, 319 F.3d at 49.

Fernández-Malavé preserved his Apprendi objection, and we assume without deciding that the remaining defendants did the same, as it makes no difference to the outcome. Defendants' trial took place from December 1998 to June 1999, before Apprendi was decided. At the time, several defendants requested a special verdict form requiring the jury to determine the drug amount and type as to each defendant. But only Fernández-Malavé, who was the sole non-CCE defendant sentenced after Apprendi was decided, challenged his sentence before the district court on this basis. The question whether the remaining defendants' special verdict request was sufficient to preserve an Apprendi objection, absent a separate objection at sentencing, is a complex one. Nelson-Rodriguez, 319 F.3d at 48. Here, as in Nelson-Rodriguez, we prefer to assume without deciding that the objection was preserved and the harmless

error standard applies.  <u>Id.</u>

The <u>Apprendi</u> error in this case was harmless beyond a reasonable doubt.  An <u>Apprendi</u> error is harmless where the evidence overwhelmingly establishes the minimum drug quantity needed to justify the statutory maximum under which the defendants were sentenced.  <u>Martinez-Medina</u>, 279 F.3d at 121-22.  Here, the government produced overwhelming evidence that the conspiracy involved at least five kilograms of cocaine, which triggers a maximum sentence of life imprisonment for all co-conspirators under 21 U.S.C. § 841(b)(1)(A) and § 846.  Government witnesses Negrón-Maldonado and Torrens-Alicea both testified that Rodríguez-López and Gonzalez-Ayala stole a 200 kilogram shipment of cocaine in Fajardo, which was then brought back to Bitumul for distribution.  Negrón-Maldonado further testified that in 1991 he purchased a kilogram of cocaine per week from Soto-Ramírez.  After May 1992, Negrón-Maldonado stated, he and another co-conspirator named Manolín, who managed Soto-Ramírez's point while Soto-Ramírez was in prison, each purchased one kilogram of cocaine per week from Soto-Beníquez to be sold at their respective drug points.  Negrón-Maldonado also testified that after January 1993, he continued to purchase from Soto-Beníquez three-eighths of a kilogram of cocaine each week for his drug point.

In addition, the government presented overwhelming evidence that the conspiracy distributed more than the 50 grams of

crack cocaine necessary to trigger a life sentence under 21 U.S.C. § 841(b)(1)(A). According to Negrón-Maldonado, 125 grams of crack cocaine would yield approximately 800 to 850 crack capsules using the conspiracy's packaging techniques. Negrón-Maldonado testified that Cintrón-Caraballo received 600 capsules of crack cocaine (90 grams) per week for distribution at his drug point in 1990, 800 to 850 capsules (125 grams) per week in 1991, and 1000 capsules (150 grams) per week in early 1993. Furthermore, Negrón-Maldonado testified that at the beginning of 1992, he would "cook" 500 grams to a kilogram of cocaine into crack cocaine two to three times per week for Soto-Ramírez's points; this alone amounts to one to three kilograms per week. At around the same time, Negrón-Maldonado himself was also selling 500 to 800 crack capsules, or between 75 to 125 grams of crack, per week. When he left for the United States, he sold an additional 2000 crack capsules, or over 300 grams of crack. All told, Negrón-Maldonado estimated that a single drug point would distribute at least one kilogram of crack cocaine per month -- more than twenty times the amount necessary to trigger a life sentence.

In the face of this overwhelming evidence, defendants argue that the testimony of co-conspirators alone is never a sufficient basis to find an Apprendi error harmless beyond a reasonable doubt. That is not so. See United States v. Stewart, 306 F.3d 295, 324-25 (6th Cir. 2002) (finding Apprendi error

harmless beyond a reasonable doubt based on the testimony of co-conspirators). Defendants offered no evidence contradicting the conspiracy-wide drug quantities at trial, and they point to no such evidence on appeal, except their attack on the general credibility of the two witnesses.

The jury in this case could not have convicted all eleven defendants of participation in the conspiracy without believing the testimony of Negrón-Maldonado and Torrens-Alicea regarding at least some of the transactions. Negrón-Maldonado and Torrens-Alicea also testified regarding the quantity of drugs involved in those transactions. Defendants offer no explanation for why the jury would believe Negrón-Maldonado and Torrens-Alicea's account of each defendant's activities in furtherance of the conspiracy, but discredit their testimony regarding the quantity or type of drugs involved in those activities. In Nelson-Rodriguez, we found an Apprendi error harmless on very similar facts: the jury could not have convicted without crediting informant testimony, the same informant testified to the drug amount, and the defendant offered no reason to disbelieve the testimony except a general attack on the witness's credibility. 319 F.3d at 49-50.

Defendants further protest that even if the conspiracy writ large involved the requisite quantities and types of drugs, the Apprendi error is not harmless. They argue that it was not reasonably foreseeable to each of them individually, from their

limited involvement, that such quantities of drugs would be involved. Under the Sentencing Guidelines, a narcotics conspirator's sentence is based on the amount of drugs he actually handled, negotiated, or saw, as well as the amount of drugs that he reasonably could have foreseen to be embraced by the conspiracy he joined. Rodriguez, 162 F.3d at 149; U.S.S.G. § 1B1.3 & cmt. 2. Defendants argue that unless this court is certain that the jury would find the drug quantity reasonably foreseeable to each defendant, the Apprendi error cannot be harmless.

We reject this argument. Apprendi does not require that the jury determine beyond a reasonable doubt the quantity of drugs foreseeable to each defendant. Apprendi requires only that juries determine facts necessary to increase the statutory maximum. 530 U.S. at 490. Here, the conspiracy-wide drug quantity determines the statutory maximum. See 21 U.S.C. § 846 (holding each conspirator responsible for the quantity of drugs distributed by the conspiracy). As long as the sentence falls within this statutory maximum, the district court may determine the quantity of drugs reasonably foreseeable to each defendant by a preponderance of the evidence and sentence each defendant accordingly. Derman v. United States, 298 F.3d 34, 42-43 (1st Cir. 2002). In determining whether an Apprendi error is harmless, the determinative question is whether the evidence overwhelmingly establishes the amount of drugs distributed by the conspiracy as a whole. It does here.

b)  Multi-Object Conspiracy
(Vega-Cosme)

Vega-Cosme raises a related argument that the defendants were charged with a multi-object conspiracy.  In a multi-object conspiracy charge, a jury convicts the defendants of distributing one type of drug <u>or</u> another type of drug.  <u>See, e.g.</u>, <u>United States</u> v. <u>Dale</u>, 178 F.3d 429, 431 (6th Cir. 1999) (jury instructed to convict if conspiracy distributed crack cocaine <u>or</u> marijuana).  Although the First Circuit has not ruled on this issue, other circuits have held that when a defendant is charged with a multi-object conspiracy, and the jury returns a general verdict, the statutory maximum should be based on the object carrying the lowest maximum penalty.  <u>See, e.g.</u>, <u>id.</u> at 432; <u>United States</u> v. <u>Orozco-Prada</u>, 732 F.2d 1076, 1083-84 (2d Cir. 1984).  Vega-Cosme argues that the jury in this case returned a general verdict on a multi-object conspiracy charge -- namely, that the defendants distributed more than five kilograms of heroin, cocaine, <u>or</u> cocaine base, <u>or</u> more than 100 kilograms of marijuana.  He argues that the statutory maximum should therefore have been based on the penalty for conspiring to distribute 100 kilograms of marijuana, which is up to forty years imprisonment under 21 U.S.C. § 841(b)(1)(B).  If this were indeed the case, Vega-Cosme's life sentence would be problematic.

Vega-Cosme's argument, though, is without merit.  The defendants were not charged with a multi-object conspiracy.  The

indictment charged them with distributing more than five kilograms each of heroin, cocaine, and crack cocaine, and more than 100 kilograms of marijuana.[10]  Because those drug quantities and types were joined by the conjunctive term "and" rather than the disjunctive term "or," there was no ambiguity about the crime charged.  See United States v. Neuhausser, 241 F.3d 460, 469-70 (6th Cir. 2001) (no Apprendi error in sentencing defendant to higher statutory maximum for cocaine conspiracy, when defendant was charged with conspiracy to distribute both cocaine and marijuana); United States v. Banks, 78 F.3d 1190, 1203 (7th Cir. 1996) (no ambiguity where indictment was phrased in conjunctive rather than disjunctive); United States v. Watts, 950 F.2d 508, 515 (8th Cir. 1991) (same).

Vega-Cosme argues that, regardless of the indictment, the jury instructions transformed Count Two into a multi-object conspiracy charge.  The jury instructions contain a definition of "possession with intent to distribute" that required the government to "prove beyond a reasonable doubt that the defendant knew he was possessing a controlled substance" but not that "the defendant knew which particular controlled substance was involved."  Vega-Cosme contends that this instruction changed the conjunctive term "and"

_____

    [10]    The indictment did not need to specify the exact amount of drugs involved in the conspiracy, as long as it alleged the appropriate threshold amounts necessary to support the defendants' sentences.  Cf. Derman v. United States, 298 F.3d 34, 42 n.4 (1st Cir. 2002).

in the indictment into the disjunctive term "or." This argument is meritless. First, this definition should not have affected the jury's consideration of the conspiracy charge. The conspiracy count of the indictment and the jury instructions regarding the elements of conspiracy require the jury to find that defendants conspired to "distribute" controlled substances to return a guilty verdict; nowhere does the term "possession with intent to distribute" appear. Second, even if the term had appeared, the definition requires the government to prove that the defendants did in fact possess specific drugs, even if they did not know which drugs they possessed. Thus, the government must still show that the defendant possessed cocaine <u>and</u> cocaine base <u>and</u> heroin <u>and</u> marijuana, even if the defendant himself did not know the specific drugs that he had in his possession. Finally, even if a multi-object conspiracy were charged and an <u>Apprendi</u> error therefore occurred, Vega-Cosme admits that review would be for plain error because he did not preserve this argument below. We have already determined that any <u>Apprendi</u> error as to drug amount or type would be harmless; a fortiori, no plain error occurred.

c) Failure to Reference § 841(b)(1)(B) in Indictment (Fernández-Malavé)

Fernández-Malavé argues that his sentence must be vacated because the indictment was defective under <u>Apprendi</u> for failing to reference specifically § 841(b)(1)(B), the statutory penalty subsection under which he was sentenced. This claim is meritless.

-92-

The indictment included threshold drug quantities and types. There is no Apprendi requirement that the penalty subsection be included in the indictment once the drug quantity and type are alleged. See United States v. Eirby, 262 F.3d 31, 38 (1st Cir. 2001).

2. Sufficiency of Evidence As to Drug Quantities
(Soto-Ramírez, Soto-Beníquez, Cintrón-Caraballo, Vega-Colón, Vega-Cosme)

Five defendants argue, separate from their Apprendi claims, that the district court erred in determining the amount of drugs attributable to them. They argue that the evidence does not establish by a preponderance the quantity or type of drugs necessary to support the calculation of their base offense levels. We review factual determinations at sentencing for clear error. United States v. Damon, 127 F.3d 139, 141 (1st Cir. 1997).

The district court's determinations of drug amounts were not clearly erroneous. Under the Sentencing Guidelines, each defendant must be sentenced based on the amount of drugs that he handled, negotiated, saw, or could reasonably have foreseen to be embraced by the conspiracy. Rodriquez, 162 F.3d at 149; U.S.S.G. § 1B1.3 & cmt. 2. Applying this standard, the district court attributed at least 1.5 kilograms of crack cocaine to each of the five defendants, resulting in a base offense level of 38 for each.

The record at trial and sentencing supports this calculation. Negrón-Maldonado testified that Soto-Ramírez sold 300 crack capsules to Cintrón-Caraballo on at least ten occasions in

1990, which amounts to 450 grams of crack cocaine. He also testified that at the beginning of 1990, Soto-Ramírez supplied him with 1000 to 1500 crack capsules, or about 150 to 200 grams, per week. Assuming that these purchases continued for at least seven weeks, Soto-Ramírez would have distributed 1.5 kilograms of crack cocaine just from sales to Cintrón-Caraballo and Negrón-Maldonado in 1990. Furthermore, according to Negrón-Maldonado's testimony, during early 1992, Negrón-Maldonado "cooked" one to three kilograms of cocaine into crack cocaine per week for Soto-Ramírez's points. In one and a half weeks, Negrón-Maldonado would have packaged at least 1.5 kilograms of crack cocaine for distribution at Soto-Ramírez's points. Although Soto-Ramírez was in prison at this time, the drug quantity was reasonably foreseeable to him because he was still supervising his drug points by telephone.

The government presented evidence that Soto-Beníquez supplied other members of the conspiracy with cocaine, which they converted into at least 1.5 kilograms of crack cocaine and distributed at their respective drug points. Negrón-Maldonado testified that each week in early 1992, he bought one to three kilograms of cocaine from Soto-Beníquez and converted it into crack cocaine. Over two weeks, this would exceed the required 1.5 kilograms. Negrón-Maldonado also testified that Soto-Beníquez supplied Cintrón-Caraballo with 125 grams of cocaine per week and Negrón-Maldonado with 75 to 125 grams of cocaine per week, which

was converted into crack cocaine for sale at their respective drug points. Over eight weeks, this would exceed the required 1.5 kilograms. Soto-Beníquez protests that he could not have reasonably foreseen that the cocaine he supplied would be converted into crack cocaine. The district court had sufficient evidence to conclude otherwise. Negrón-Maldonado testified that Soto-Beníquez's house was used, repeatedly, as a location for converting cocaine into crack cocaine. He also testified that when Cosme-Sobrado was killed, Soto-Beníquez picked up the proceeds from Soto-Ramírez's crack cocaine point and determined that money was missing. Bitumul is a small community; given Soto-Beníquez's involvement, it would be difficult for him to be wholly ignorant that his co-conspirators were producing crack cocaine. These activities and Soto-Beníquez's leadership role in the conspiracy are sufficient to support the conclusion that Soto-Beníquez knew Negrón-Maldonado and Cintrón-Caraballo sold crack cocaine at their points and that he could have reasonably foreseen that the cocaine he supplied to them would be converted into crack cocaine.

Cintrón-Caraballo's crack cocaine point was in operation throughout the duration of the conspiracy, according to Negrón-Maldonado's testimony. Negrón-Maldonado testified that Cintrón-Caraballo purchased over 90 grams of crack cocaine per week for distribution at his point in 1990, 125 grams per week in 1991, 125 grams on a regular basis in 1992, and over 150 grams per week in

early 1993.  Assuming that Cintrón-Caraballo's drug point operated at least four weeks each year, the total amount of crack cocaine purchased for distribution would exceed 1.5 kilograms.

Negrón-Maldonado testified that the drug point operated by Vega-Cosme and Vega-Colón sold crack cocaine in 1990, 1992, and 1993.  Negrón-Maldonado estimated that one drug point distributing crack cocaine would usually sell at least one kilogram per month.  That volume of sales alone is sufficient to exceed the required 1.5 kilograms.  In addition, the government presented evidence indicating that the quantity of crack cocaine sold by Negrón-Maldonado and Cintrón-Caraballo was reasonably foreseeable to Vega-Cosme.  Vega-Cosme met at least three times with the others to coordinate the color of the caps on their respective crack capsules.  These meetings are evidence that Vega-Cosme had some awareness of his co-conspirators' crack cocaine sales and that, after color-coding was instituted, he had some way of tracking their activities.

In response, all five defendants argue that this evidence is unreliable because it is based on the testimony of cooperating co-conspirators and was uncorroborated.  Vega-Colón and Vega-Cosme argue in their brief that absent a rule requiring corroboration of such evidence, "unsuspecting defendants would be entirely at the mercy of cooperating co-defendants, who have all the incentive in the world to testify in a manner [whether truthful or not] that

will assist the government in obtaining a larger sentence." That risk is real, but vacating their sentences for lack of corroboration is not the answer.[11] Here, the cooperating co-defendants were vigorously cross-examined, and defense counsel had the opportunity to present evidence of the witnesses's plea agreements, grants of immunity, and receipt of government money. If the government's dilatory production of discovery materials had impeded the cross-examination, the situation might be different. But it did not. The jury found the co-conspirators credible, and, for sentencing purposes, so did the trial court. These plausible credibility determinations cannot be disturbed on appeal. Cf. Torres-Galindo, 206 F.3d at 139-40 ("Uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible . . . .").

3.    Alleged Rule 32 Violation
      (Cintrón-Caraballo, Vega-Cosme)

Cintrón-Caraballo argues that the district court erred (1) in permitting the government to introduce evidence in support of an upward adjustment for his role as a supervisor in the conspiracy under U.S.S.G. § 3B1.1 and (2) in granting the adjustment. Although the probation officer did not include the upward adjustment for a supervisory role in the PSR and the

---

[11]    If the government is mindful of its obligations, countervailing incentives, such as avoidance of perjury charges, can reduce the incentive to lie.

government did not object to this omission before sentencing, the government attempted to argue the upward adjustment to the court at the sentencing hearing.  We agree with Cintrón-Caraballo that this course of action violated Fed. R. Crim. P. 32, which requires that "[w]ithin 14 days after receiving the presentence report, the parties shall communicate in writing to the probation officer, and to each other, any objections" to it.  Fed. R. Crim. P. 32(b)(6)(B) (2000) (amended 2002).

Any possible prejudice to Cintrón-Caraballo from the government's non-compliance was cured by the district court's grant of a two-week continuance to give defense counsel an adequate opportunity to respond to the government's late submission.  See United States v. Young, 140 F.3d 453, 457 (2d Cir. 1998) ("The sentencing court may impose sentencing enhancements belatedly suggested by the Government and not contained in the PSR, provided the defendant is afforded an adequate opportunity to respond . . . ." (internal citation omitted)).

Vega-Cosme raises a similar argument that the district court erred in granting a two-level upward adjustment for possession of a weapon.  Here again, the adjustment was not included in the PSR, and the prosecution did not object to its omission before sentencing but argued for the enhancement at sentencing, which was in violation of Rule 32.  Because Vega-Cosme did not object at sentencing, review is for plain error.  United

States v. Frisby, 258 F.3d 46, 47-48 (1st Cir. 2001).  There was none.  Vega-Cosme had the opportunity to respond to the evidence at the sentencing hearing.  Contrast United States v. Curran, 926 F.2d 59, 62 (1st Cir. 1991), in which the court vacated a defendant's sentence when he had no opportunity to contradict letters that were not included in the PSR and that the court relied upon in reaching its decision.  Given the trial testimony regarding Vega-Cosme's role in obtaining ammunition for the conspiracy and the extensive murder evidence presented at trial, the government's belated seeking of a firearms enhancement could not have come as such a surprise to Vega-Cosme as to render the entire sentencing proceeding a miscarriage of justice.

> 4. Denial of Downward Adjustment
>    (Gonzalez-Ayala, de León Maysonet)

Gonzalez-Ayala and de León Maysonet argue that the district court committed an error of law when it refused to grant them a downward adjustment based on their roles as minor participants in the conspiracy.  They argue in their brief that the district court "failed to realize that the guidelines permitted the sentencing court to decrease defendants' sentencing level" based on the fact that "the appellants' level of participation was below that of the other defendants."  Mistakes of law in applying the Sentencing Guidelines are reviewed de novo.  United States v. Cali, 87 F.3d 571, 575 (1st Cir. 1996).  The district court made no

mistake of law.

The district court correctly determined that these defendants were not entitled to a minor-role adjustment merely because they were the least culpable among those who were actually indicted.  See United States v. Daniel, 962 F.2d 100, 103 (1st Cir. 1992).  The relevant inquiry is whether the defendant played a part that made him substantially less culpable than the average participant in similar crimes.  See U.S.S.G. § 3B1.2 cmt. 3; United States v. Brandon, 17 F.3d 409, 460 (1st Cir. 1994).

Absent a mistake of law, we review the district court's fact-based determination that a defendant was not a minor participant for clear error.  United States v. Rosario-Peralta, 199 F.3d 552, 571 (1st Cir. 1999).  The court's determination was not clearly erroneous.  The government presented testimony at trial that de León Maysonet stored weapons and narcotics for the conspiracy in 1992, stood as an armed guard at drug points in 1993, and packaged and sold narcotics at the Callejón Nueve point in 1993.  The government also presented evidence at trial that he participated in an unsuccessful mission to Fajardo to find and kill an individual named Vitito, who had been hired to kill those responsible for stealing the 200 kilograms of cocaine.  The evidence is sufficient to support the district court's finding that de León Maysonet was not a minor participant, based on his two-year involvement and his participation in a variety of criminal activities  in support of the

conspiracy. As to Gonzalez-Ayala, government witnesses Negrón-Maldonado and Torrens-Alicea testified at trial that he participated in the planning and execution of the theft of 200 kilograms of cocaine in Fajardo and that he received profits from the sale of that cocaine. They also testified that he helped package heroin and cocaine for distribution at the Callejón Nueve point. The record supports the district court's conclusion, based on the quantity of drugs he helped obtain for the conspiracy and his ongoing role in the packaging and sale of those drugs, that Gonzalez-Ayala was not a minor participant.

5. Grant of Upward Adjustment
   (Cintrón-Caraballo)

Cintrón-Caraballo argues that the evidence was insufficient to support the district court's grant of a three-level sentencing enhancement for his role as a supervisor in the conspiracy under U.S.S.G. § 3B1.1(b). Under the Sentencing Guidelines, a three-level enhancement is permissible "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Review of this determination is for clear error. United States v. Brown, 298 F.3d 120, 122 (1st Cir. 2002).

The district court correctly counted the eleven defendants convicted in the trial as meeting the "five or more participants" prong. The more serious question is whether Cintrón-Caraballo was

a manager or supervisor, terms not defined in the Sentencing Guidelines but described in U.S.S.G. § 3B1.1 cmt. 4 as involving:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Cintrón-Caraballo argues that there was no firm evidence that he was a supervisor; there was only rumor and innuendo. But the government presented testimony at trial that Cintrón-Caraballo controlled a drug point at Street B that sold crack cocaine and that he had "Nanito, . . . Bennie's little brothers, and other persons" selling for him. He also had Negrón-Maldonado cook cocaine into crack for his drug point. The district court did not clearly err in finding that Cintrón-Caraballo acted as a supervisor in running his drug point.

6. Denial of Downward Departure
(Soto-Ramírez)

Soto-Ramírez challenges the district court's denial of a downward departure based on his upbringing. The record contained well-documented evidence that Soto-Ramírez had suffered severe neglect and sexual abuse as a child. A denial of a downward departure is generally non-reviewable unless the lower court's failure to depart stemmed from a misapprehension of its authority under the Sentencing Guidelines. See United States v.

Rivera-Rodriguez, 318 F.3d 268, 275 (1st Cir. 2003). This standard is unaffected by the PROTECT Act, which applies when the decision made is to grant a departure. 18 U.S.C. § 3742(e). Here, Soto-Ramírez argues that the district court failed to recognize that it had the power to grant a downward departure based on abuse that Soto-Ramírez suffered as a child. But the district court did acknowledge its power to depart. It expressly stated, "I have [the] authority to depart because of an upbringing situation which may have affected the defendant." Accordingly, we have no jurisdiction to review its decision on this issue.

**IV.**

This was a lengthy and complex case handled patiently and well by the trial court. Despite missteps by the prosecution, defendants received a fair trial and sufficient evidence supported both the verdicts and the sentences for each defendant, which are **affirmed**. So ordered.