**UNITED STATES of America,**

v.

**Celicia HOOVER–HANKERSON,
Benjamin Hoover,
Defendants.**

**No. CRIM. 03–188(RWR).**

United States District Court,
District of Columbia.

Dec. 30, 2005.

upon sentence.

John O. Iweanoge, Jr., The Iweanoges Firm, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERTS, District Judge.

A trial jury convicted defendants Celicia Hoover–Hankerson and Benjamin Hoover of conspiracy, two counts of theft from programs receiving federal funds and two counts of fraud in the first degree. That same day, the defendants moved for and were granted a two-week extension of time under Federal Rule of Criminal Procedure 29(c)(1) to renew their motions for judgment of acquittal. Both defendants timely moved for judgment of acquittal, arguing that the government failed to produce sufficient evidence to convict them. Both defendants also moved at the end of that two-week period for a new trial under Rule 33. Because the court lacks jurisdiction to entertain defendants' new trial motions, those motions will be denied. Because the government produced sufficient evidence to sustain the verdicts rendered against both defendants on Counts 1, 2, 4, and 5,

and against Hoover–Hankerson on Count 3, defendants' motions for judgment of acquittal will be denied as to those counts. Because the government did not produce sufficient evidence to prove Count 3 against Hoover, judgment of acquittal will be granted on that count as to him.

### BACKGROUND

The defendants were indicted for conspiracy to commit theft from a witness voucher program receiving federal funds in violation of 18 U.S.C. § 371 (2000) (Count 1); theft from a witness voucher program receiving federal funds and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 (Count 2); theft from an investigator voucher program receiving federal funds and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 (Count 3); and fraud in the first degree with respect to the witness vouchers and investigator vouchers, in violation of D.C.Code §§ 22–3821(a), 22–3822(a)(1) (1981)[1] (Counts 4 and 5 respectively). The following evidence, recited in the light most favorable to the verdict, see *United States v. Campbell*, 702 F.2d 262, 264 (D.C.Cir.1983), was produced during the course of the seven-day trial.

### I. WITNESS VOUCHERS

An indigent criminal defendant entitled to appointed counsel pursuant to the Criminal Justice Act ("CJA") may have a defense witness paid a witness fee by check drawn on public funds under District of Columbia Superior Court Rule of Criminal Procedure 113. Attorneys appointed by the court may obtain blank witness fee vouchers from the court's voucher office for use in the defense of

---

1. The indictment cites the 1981 edition of the D.C.Code. These statutes appear in the 2001 edition at D.C.Code §§ 22–3221(a) and 22–3222(a)(1).

indigent criminal defendants. The voucher office will not release blank witness vouchers to non-attorneys. The attorneys must present identification, sign a log book for the vouchers issued, and safeguard the vouchers that they sign out. After January 28, 2002, the District of Columbia courts revised their policies to better implement Rule 113 by requiring any attorney requesting a witness voucher to present supporting documentation, such as a subpoena, to certify that the witness was compelled to attend court proceedings. Attorneys report when vouchers are lost and stolen. The court will void a lost or stolen voucher and notify its internal audit groups.

To be paid, the witness must certify on a witness voucher that he was compelled by subpoena to attend as a witness on behalf of the defendant and did attend the criminal case. The defense lawyer also must sign the voucher certifying the witness's attendance. The witness fee is $40.00 for one day's attendance.

Hoover–Hankerson, a CJA attorney, signed out 2,087 witness vouchers under the District of Columbia Superior Court CJA voucher program between October 1, 1998 and February 7, 2001. The average number of such vouchers signed out by CJA attorneys during the same time period was 61. Hoover–Hankerson did not report that any vouchers signed out by her were lost or stolen.

Superior Court voucher office employee Vicki Jeter came to know Hoover–Hankerson because of the frequency with which Hoover–Hankerson would appear to sign out vouchers. Jeter stated that Hoover–Hankerson signed out more vouchers than any of the other attorneys, at times twice in one week or every other day. Jeter sometimes saw Hoover or Troy Robinson, both defense investigators, accompanying Hoover–Hankerson when she signed out vouchers. Employee Beatrice Pearson saw Hoover–Hankerson accompanied by Hoover on some occasions when Hoover–Hankerson signed out vouchers. Robinson testified that he and Hoover had passed out false witness vouchers from 1998 to 2002.

The jury heard from several individuals who cashed witness vouchers that had been issued in blank by the voucher office to Hoover–Hankerson and purportedly signed by Hoover–Hankerson before being cashed. Antonio Brown had received witness vouchers on a number of occasions from Robinson, a childhood acquaintance. At Robinson's direction, Brown would sign and take the vouchers to the Superior Court to cash them. He would receive a $40.00 check for a voucher and after cashing it, keep $15.00 (or half) and turn over the remainder to Robinson on 17th Street. Brown would see Hoover with Robinson when Robinson handed Brown vouchers and when Brown turned over some of the proceeds. Brown heard Hoover referred to as "Ben." Brown had never been subpoenaed for or appeared as a witness in the cases which were the subjects of the vouchers. The signature lines for the certifying attorneys on his vouchers contained what appeared to him to be the same signature. He had never met Hoover–Hankerson, and he did not know the source of Robinson's vouchers.

Marvin Brown had known Robinson for decades, but did not know Hoover–Hankerson. Robinson or Hoover would give Marvin Brown witness vouchers at either 17th and Euclid Streets or near the Superior Court buildings. Marvin Brown had never been subpoenaed for a case and he never appeared in a case. He had seen Robinson and Hoover together on multiple occasions when he would get vouchers. He had also seen Hoover pass out vouchers to other individuals in the 17th and

Euclid Streets area. Marvin Brown would cash the vouchers, keep $15.00 or $20.00 per voucher, and give the rest to whoever had given him the voucher. He gave Hoover proceeds from one voucher in front of a liquor store on 6th Street.[2]

Michael Taylor also cashed witness vouchers for cases for which he was never subpoenaed and for which he never appeared. His first involvement with witness vouchers occurred when Robinson approached him to meet at 601 Indiana Avenue to get the vouchers. There were eight to ten individuals there, including Hoover. The entire group walked over to the Superior Court to cash the vouchers and took the checks to a local liquor store. Taylor kept $15.00 per voucher and gave the rest to Robinson. Hoover was there when Taylor returned some of the voucher proceeds to Robinson. Hoover accompanied Taylor to the liquor store on more than one occasion to cash the checks. Taylor saw others give Hoover voucher proceeds four to five times.

Taylor saw Hoover and Robinson together at 601 Indiana Avenue eight to ten times when he went there to obtain vouchers. He saw Hoover–Hankerson on four to five separate occasions when Robinson or Hoover would go into a room with Hoover–Hankerson and return to Taylor with vouchers. Taylor never had direct interaction with Hoover–Hankerson, and Robinson and Hoover never spoke directly to Hoover–Hankerson in his presence. However, Taylor noticed that Hoover, Robinson, and Hoover–Hankerson would engage in secretive behavior and close the door each time they went into the office.

The government introduced paid witness vouchers that purported to have the name Hoover–Hankerson signed on the signa-

ture line for the attorney. Handwriting expert Brittany King opined that 471 of 864 attorney signatures on 427 different vouchers were written by the same individual. King concluded that similarities in an additional 382 of the signatures suggested that those signatures were written by the same individual. Her examination was inconclusive as to eleven of the 864 attorney signatures.

Hoover was employed as an investigator in Washington, D.C. by his wholly owned business, Hoover Investigations. In addition, he was variously employed at three other locations in Maryland: E and G Classics, Victor Cullen Academy, and St. Bernardine Catholic School. There were 246 witness vouchers signed out from the voucher office with the name Hoover–Hankerson appearing in the log book attorney signature column that were ultimately processed for payment from October 5, 1998 to December 11, 2001 certifying that Hoover had appeared as a witness in a case. Hoover did not submit any witness vouchers after the Superior Court revised its policies on January 28, 2002, requiring an attorney seeking to obtain a blank witness voucher to first produce proof that a witness had in fact been compelled to testify. Among the appearance dates and times listed on those vouchers were at least eight dates and times on which Hoover's time and attendance log at one of his Maryland places of employment reflected Hoover's presence there.

Hoover–Hankerson's husband, Ernest Hankerson, was employed in Harrisburg, Pennsylvania. He submitted 328 witness vouchers with her name signed on them. Two hundred ninety-four of those vouchers claimed appearances at times when his

2. Marvin Brown admitted on cross-examination that he had stated previously that he had never met Hoover. Marvin Brown explained that he drew a distinction between meeting someone and "seeing" him.

time and attendance records at his Pennsylvania job reflected his presence there.

## II. INVESTIGATOR VOUCHERS

Investigators assisting CJA attorneys in CJA qualified cases may be paid using investigator vouchers. On an investigator voucher, the attorney has to certify that the work completed by an investigator was completed satisfactorily. The government introduced evidence of numerous investigator vouchers submitted by Hoover's investigation corporation and by Ernest Hankerson, Hoover–Hankerson's husband, bearing what purported to be signatures of Hoover–Hankerson. (Gov't Ex. 9e–1, 9c–2.) Investigator Diane Eickman testified that 32 of the investigator vouchers claimed that Hankerson had conducted investigatory work during certain times that his attendance log for employment in Harrisburg, Pennsylvania reflected him at work there. Similarly, Eickman testified that eleven of Hoover's investigator vouchers claimed investigative work at times when his time and attendance records at Victor Cullen Academy and St. Bernardine reflected Hoover's presence in Maryland. (See Gov't Ex. 9f.) Hoover submitted those eleven vouchers between February 27, 2002 and February 27, 2003 claiming a total of $3,962.37. Hankerson submitted sixteen such vouchers between February 27, 2001 and February 27, 2002 claiming a total of $2,404.40, and submitted twelve such vouchers between February 27, 2002 and February 27, 2003 claiming a total of $4,325.89.

## III. MOTIONS

Just after the jury delivered its verdicts, counsel for defendant Hoover requested an extension of at least fourteen days to file a motion for judgment of acquittal notwithstanding the jury verdict. Counsel specified that he based his request on Rule 29.

Counsel for Hoover–Hankerson joined in that motion without further comment. The government did not oppose. The court engaged defendant Hoover's counsel in a discussion about the court's discretion to grant an extension of time to file a motion for judgment of acquittal. Counsel repeatedly identified Rule 29 as the authority to grant an extension of time. Before the court agreed to the motion for an extension of time, counsel was questioned whether any other seven-day limit in the rules governed the discretion to award an extension. Counsel replied that it was indeed Rule 29(c)(1). The court stated that it would extend the "seven-day period to fourteen days [in] which to allow both defendants to file a post-verdict Rule 29 motion." (Tr. of 7/8/04, afternoon session, at 36.) Hoover filed on the fourteenth day a motion for judgment of acquittal and/or for a new trial. Hoover–Hankerson filed a motion for judgment of acquittal on the fourteenth day and submitted a supplemental motion for a new trial on the fifteenth day.

### DISCUSSION

### I. MOTION FOR JUDGMENT OF ACQUITTAL

█ Federal Rule of Criminal Procedure 29(c)(1) states that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later, or within any other time the court sets during the 7–day period." A court lacks authority to entertain a motion for judgment of acquittal if it is untimely filed. *See Carlisle v. United States,* 517 U.S. 416, 421, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996). If the motion is timely made, "[t]here is only one ground for a motion for judgment of acquittal. This is that the evidence is insufficient to sustain a conviction of one or more of the

offenses charged in the indictment or information." 2A Charles Alan Wright, *Federal Practice & Procedure: Criminal* § 466 (3d ed.2000) (footnote and internal quotations omitted).

■ In determining the sufficiency of the evidence to sustain a conviction, "after viewing the evidence in the light most favorable to the prosecution, [a court must determine whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Because a court must recognize the "right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact," *United States v. Edmonds,* 765 F.Supp. 1112, 1116 (D.D.C.1991) (quoting *United States v. Reese,* 561 F.2d 894, 898 (D.C.Cir.1977)), and "presume that the jury has properly carried out its functions of evaluating the credibility of witnesses," *Campbell,* 702 F.2d at 264, a jury determination will stand unless "no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *Id.* " '[W]hen a reasonable mind might fairly have a reasonable doubt of guilt or might fairly have none, the decision is for the jury to make.' " *Edmonds,* 765 F.Supp. at 1116 (quoting *United States v. Herron,* 567 F.2d 510, 514 (D.C.Cir. 1977)). Moreover, "there is no requirement of any direct evidence of guilt if there exists sufficient circumstantial evidence to support the verdict[,]" *id.* (quoting *United States v. Poston,* 902 F.2d 90, 94 n. 4 (D.C.Cir.1990)), though a jury "cannot be permitted to speculate if the evidence" is so scant and insubstantial that a guilty verdict would be unreasonable. 2A Charles Alan Wright, *Federal Practice & Procedure: Criminal* § 467.

## A. *Conspiracy*

■ The defendants were charged with and convicted of conspiracy to commit theft from the witness voucher program. Hoover–Hankerson argues that there is insufficient evidence to show that she "actually reached an agreement with any alleged coconspirator," and argues that the government's own witnesses "specifically testified that they had no agreement with ... Hoover–Hankerson ... [and had not] provided any proceeds from the witness'[s] vouchers to [her]." (Hoover–Hankerson's Mot. to Set Aside the Conviction and P. & A. in Supp. ("CHH Mot.") at 9.) Hoover likewise argues that the government failed to establish that there "was an agreement between [him] and any other individual charged in the indictment to commit theft" or that he knowingly and intentionally joined in any agreement. (Hoover's Mot. for J. of Acquittal & /or New Tr. ("BH Mot.") at 2.) Hoover argues that the evidence showed only that he was in the neighborhood where the witness fee vouchers were handed out by Robinson. (*Id.* at 2–3.)

"In order to convict a defendant of conspiracy under 18 U.S.C. § 371, a jury must find that the defendant entered into an agreement with at least one other person to commit a specific offense ... as well as that the defendant knowingly participated in the conspiracy with the intent to commit the offense and that at least one overt act was committed in furtherance of the conspiracy." *United States v. Gatling,* 96 F.3d 1511, 1518 (D.C.Cir.1996). "In order to prove that an agreement existed, the government need only show that the conspirators agreed on the essential nature of the plan, not that they agreed on the details of their criminal scheme. It is well established that an agreement sufficient to support a conspiracy conviction can be inferred from circumstantial evidence." *Id.*

(internal quotations and citations omitted); *see also United States v. Pemberton,* 121 F.3d 1157, 1166 (8th Cir.1997).

From the evidence offered at trial, a reasonable jury could have found that an agreement existed between Hoover and Hoover–Hankerson and others to commit theft from the witness voucher program. It is of no moment that there may have been, as the defendants contend, little direct evidence of an agreement or the defendants' knowing joinder in that agreement, for "[i]t is unusual to have direct evidence of the conspiracy. Circumstantial evidence, including inferences from a development and a collection of circumstances, suffices to prove participation in a conspiracy." *Edmonds,* 765 F.Supp. at 1116 (internal quotations omitted). Here, the evidence established that Hoover–Hankerson signed out 2,047 witness vouchers over a period of time when the average number of vouchers signed out by other CJA attorneys was 61, that her signature appeared on fraudulent vouchers submitted by Taylor, Antonio Brown and Marvin Brown, and that Taylor, Antonio Brown and Marvin Brown each received their vouchers from either Robinson or Hoover. Taylor testified that he saw Hoover–Hankerson, Hoover and Robinson together shortly before he received a number of vouchers, and that they behaved secretively.

A reasonable juror could have found that Hoover and Hoover–Hankerson agreed to commit theft knowingly and intentionally from numerous factors: the secretive interaction among Hoover–Hankerson, Hoover and Robinson immediately preceding Taylor's receipt of witness vouchers; Robinson and Hoover's acceptance of proceeds from fraudulent vouchers; Hoover–Hankerson's signatures on the vouchers [3]; and the fact that only attorneys could sign out the vouchers from the Superior Court and that Hoover–Hankerson had not reported any of the 2,047 vouchers missing or stolen. Although Antonio Brown, Marvin Brown and Taylor each testified that he had not made any agreement or interacted with Hoover–Hankerson directly, a reasonable juror could infer from the evidence that Hoover–Hankerson signed out vouchers and passed them on to Hoover and others to distribute to individuals in the 17th and Euclid Streets neighborhood to cash. In any case, in a criminal conspiracy, "the government need only show that the conspirators agreed on the essential nature of the plan, not that they agreed on the details of their criminal scheme[,]" or knew the identity of all the co-conspirators. *Gatling,* 96 F.3d at 1518 (internal quotations and citations omitted); *see also United States v. Guerra–Garcia,* 336 F.3d 19, 23 (1st Cir.2003) ("A defendant need not have knowledge of all the details of the conspiracy, the participants in the conspiracy, or their acts.").

In addition, the very fact that Hoover himself submitted witness vouchers on at least eight different occasions which conflicted with times when he had signed in at work outside of the District of Columbia

---

**3.** Hoover–Hankerson argues that the lack of conclusive identification by the handwriting expert as to each of the 2,047 vouchers renders the evidence insufficient to prove that Hoover–Hankerson committed or agreed to commit witness voucher theft or fraud. A reasonable jury could easily reject that argument given the plethora of signatures the handwriting expert did identify as Hoover–Hankerson's from among just the sample of the vouchers examined. Moreover, the jurors were free to decide for themselves by looking at the vouchers admitted in evidence whether the signatures are consistent and uniform. *See, e.g., United States v. Oskowitz,* 294 F.Supp.2d 379, 384 (E.D.N.Y.2003) (noting that jurors can make a conclusion as to authorship based on their own experiences with the aid of an expert who testifies as to how similarity is judged in handwriting samples).

could support the inference that Hoover knowingly agreed to commit theft. While Hoover–Hankerson may claim that when she obtained the witness vouchers, she did not know or agree that witnesses would fraudulently fill out the vouchers, it was entirely reasonable for a juror to conclude that Hoover–Hankerson knowingly distributed those vouchers to individuals who would pass them on to others who were not compelled to appear in court. *See, e.g., Pemberton,* 121 F.3d at 1167 ("In particular, [the defendant's] signature on the auditor's representation letter, which contained the false statement ... reasonably could lead the jury to the inference that [the defendant] intended to mislead the auditor and the Interior Department. [The defendant] suggests that he did not know that the statement was false, but the jury quite reasonably could have determined that [he intended to commit fraud].") It is not the task of the court to choose among competing inferences that can be drawn from evidence. "The traditional deference accorded to a jury's verdict is especially important when reviewing a conviction for conspiracy ... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir.2003) (internal quotations omitted). The evidence here is not so scant or meager such that no reasonable juror could have found the defendants guilty of knowingly agreeing to commit theft.

### B. *Theft and fraud: witness vouchers*

■ The defendants were charged in Count 2 with theft concerning witness vouchers and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2, and in Count 4 with fraud in the first degree, in violation of D.C.Code §§ 22–

3821(a), 22–3822(a)(1) (1981). Conviction of theft requires proof that (1) that defendants were "agent[s] of an organization, or of a State [or] local ... government, or any agency thereof"; (2) that defendants embezzled, stole, obtained by fraud, knowingly converted, or intentionally misapplied property that is "valued at $5,000 or more" from "such organization, government, or agency"; and (3) that such "organization, government, or agency receives, in any one year period, [federal assistance] in excess of $10,000." 18 U.S.C. § 666(a)(1)(A); *see also United States v. Cornier–Ortiz,* 361 F.3d 29, 33 (1st Cir.2004) (setting forth elements of theft). First degree fraud is established upon proof that the defendants "engage[d] in a scheme or systemic course of conduct with intent to defraud or to obtain property of another by means of a false or fraudulent pretense, representation, or promise and thereby obtain[ed] property of another or cause[d] another to lose property." D.C.Code § 22–3821(a) (1981); *Bell v. United States,* 790 A.2d 523, 529 (D.C.2002). "In order to aid and abet the commission of an offense, a defendant must 'associate himself' with it, must 'participate in it as in something that he wishes to bring about,' and must 'seek by his action to make it succeed." *Campbell,* 702 F.2d at 265 (quoting *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949)).

Hoover argues that the government failed to establish that at least $5,000.00 worth of witness voucher fees were obtained by fraud, and that there is insufficient evidence to show that he participated in the scheme to defraud knowingly, willfully, and with intent to defraud the witness voucher program. Hoover also argues that there was no evidence that he received any of the proceeds of the funds and that it would be "illogical for [him] to be involved in a scheme that only benefits

people that he is not acquainted with."[4] (BH Mot. at 5.)

A reasonable juror could have found that defendant Hoover obtained or caused the Superior Court to lose by fraud over $5,000.00 through false witness vouchers. The government's evidence showed that Hoover submitted 246 witness vouchers. If all of the vouchers were false, Hoover would have received $9,840.00, well over the jurisdictional amount. A jury could have inferred from Hoover's failure to submit a single witness voucher after January 28, 2002—when the Superior Court changed its procedures to require a copy of a subpoena for each witness voucher it issued—that each of the 246 witness vouchers was fraudulent.[5] Coupled with Robinson's testimony that he and Hoover did pass out false witness vouchers, and with evidence from Taylor that Hoover, on occasion, accompanied Taylor to the liquor store for a voucher handed to him by Robinson, that Taylor saw Hoover distributing vouchers in the 17th and Euclid Streets neighborhood, and that Hoover and Robinson often were seen together as Robinson passed out vouchers, there is sufficient evidence from which a reasonable juror could have found that Hoover obtained by fraud, or caused the Superior Court to lose by fraud, over $5,000 in witness voucher fees. *See United States v. Naiman,* 211 F.3d 40, 47–48 (2d Cir.2000) (rejecting defendant's argument that the government failed to prove that he had misapplied more than $5,000 despite only circumstantial evidence showing that the federal program did not receive the funds found to have been misapplied by the defendant).

Hoover–Hankerson argues that there is insufficient evidence to establish that she aided and abetted in the theft involving witness vouchers because the government failed to prove that she intended for anyone to succeed in committing theft.[6] There is ample evidence for a reasonable juror to conclude that Hoover–Hankerson had the intent to facilitate the commission of theft by, at the least, Hoover and Robinson; that she knew that the witness vouchers would be used to commit fraud; and that Hoover and Robinson distributed the vouchers in the 17th and Euclid Streets neighborhood to receive some of the proceeds themselves. A rational trier of fact could conclude that, by signing out 2,087 witness vouchers, well above the average

4. For the same reason that defendant Hoover's sufficiency challenge fails on the conspiracy count, defendant's assertion that the government failed to prove that he knowingly participated in a scheme to defraud the Superior Court with false witness vouchers on Count 4 fails as well.

5. In asserting that the jury was not allowed to hear the allegation that he failed to submit a single witness voucher after the Superior Court changed its procedures, Hoover misrecollects the evidence that was admitted. Government exhibit 51, which sets forth the policy for signing out witness vouchers after January 2002, was admitted in evidence over defendant Hoover's objection on June 28, 2004. To the extent that Hoover argues that had the policy change not been admitted in evidence, the remaining evidence would have been insufficient to support a conviction, that argument is not one proper for a Rule 29 challenge. *See United States v. Diaz,* 300 F.3d 66, 77–78. (1st Cir.2002). Under Rule 29, a court reviewing the sufficiency of the evidence must consider all the evidence submitted to a jury, " 'regardless of whether it was properly admitted.' " *Id.* (quoting *United States v. Gonzalez–Sanchez,* 825 F.2d 572, 588 (1st Cir.1987)).

6. Hoover–Hankerson does not raise in her renewed motion insufficiency arguments regarding Count 4, fraud in the first degree with respect to witness vouchers. However, for the same reasons that there is sufficient evidence to convict her on the conspiracy count, there is sufficient evidence to sustain the fraud conviction regarding witness vouchers.

number that CJA attorneys obtained during the relevant time period, and distributing them to investigators who had been seen passing them out to investigators who would not be witnesses, Hoover–Hankerson actively assisted others in the commission of theft. Furthermore, Hoover–Hankerson's husband submitted 294 witness vouchers with her name signed on them which conflicted with his time and attendance records at his Pennsylvania job. Taylor also testified that he saw Hoover–Hankerson, Hoover and Robinson furtively meeting immediately before he was handed witness vouchers to commit fraud. A juror could reasonably infer from the evidence that Hoover–Hankerson actively facilitated the commission of theft by signing out vouchers which she knew would be cashed fraudulently. *See, e.g., Poston,* 902 F.2d at 95 (finding circumstantial evidence sufficient to convict defendant of aiding and abetting another's possession of drugs).

C. *Theft and fraud: investigator vouchers*

■ Hoover–Hankerson argues that there is little evidence to show that she was part of a joint effort to commit theft with investigator vouchers, and that the fraud count based on investigator vouchers must also fail for failure to prove knowing and willful participation in such fraud. Specifically, she argues that there was no direct evidence that she was aware that Hoover or Hankerson had not performed the investigator services. (CHH Mot. at 12–13.) There is sufficient evidence, however, to infer that Hoover–Hankerson knew that the investigator vouchers submitted by her husband and Hoover were false. Government exhibits 9c–2 and 9e–2

detail conflicts in the time claimed on Hoover and Hankerson's investigator voucher submissions. Given those time conflicts, the volume of vouchers, certifications bearing Hoover–Hankerson's apparent signatures that the suspect investigator work was completed, and the extensive time period over which the suspect vouchers were submitted, a rational juror could find that Hoover–Hankerson aided and · abetted Hankerson and Hoover in their false submissions. Similarly, this evidence is sufficient to sustain a finding of knowing participation by her in investigator voucher fraud.

Likewise, there is sufficient evidence to show that defendant Hoover committed fraud in the first degree with respect to the investigator vouchers. Voucher 1AX0006803 (Gov't Ex. 9e–2) alone satisfies the minimum $250.00 amount required to sustain the conviction, and the jury could have found that Hoover had intended to commit fraud by comparing the hours claimed on the voucher to his time and attendance logs at his place of employment.[7]

■ Hoover's theft conviction poses a more difficult question. Hoover challenges whether the government proved the requisite jurisdictional amount of loss for the theft charge related to investigator vouchers. Given that the total of the vouchers submitted by Hoover amounted to $3,962.37, he argues that the government failed to prove the $5,000.00 of loss required under the statute. The government argues that the evidence established that $11,408.42 worth of vouchers were submitted by Hoover and his "accomplice and coconspirator Ernest Hankerson."

---

**7.** Although Hoover argues that the vouchers were submitted on behalf of Hoover Investigations and that an investigator working for Hoover could have turned in those vouchers, the government need not counter every plausible innocent explanation. *See United States v. Patterson,* 644 F.2d 890, 893 (1st Cir.1981).

(Gov't Opp'n at 8.) Because the government did not charge the defendants with any conspiracy to commit investigator voucher fraud, or allege at trial that such a conspiracy existed, it cannot establish that the jury found such an agreement or use it to attribute Hankerson's fraudulent conduct to Hoover.

Although a jurisdictional amount can be reached through the conduct of aiders and abettors, the evidence here did not establish that Hoover aided and abetted a principal or an accomplice who, with Hoover, converted over $5,000.00 from a program receiving federal funds. The government provided no evidence to show that Hoover aided and abetted—that is, actively facilitated—Hankerson's investigator voucher fraud. The government cannot use Hoover's membership in a conspiracy to commit witness voucher fraud to prove that he aided and abetted Hankerson in any purported separate and distinct investigator voucher scheme. *See United States v. Wiley,* 846 F.2d 150, 155 (2d Cir.1988). Nor was there evidence that Hoover and Hankerson helped each other in committing investigator voucher fraud. No evidence was introduced that Hoover and Hankerson performed investigative work together, met together with Hoover–Hankerson just before or after their investigator vouchers were submitted, submitted those vouchers together, commingled or shared the proceeds of those vouchers, discussed with each other the investigator voucher fraud scheme, or otherwise knew that each other was involved in such a scheme. Drawing all reasonable inferences in the government's favor from the evidence produced at trial, there would be insufficient evidence to convict Hoover of aiding and abetting Hankerson [8] as a principal or an accomplice such that the jurisdictional amount could be reached.

Conceivably, Hoover could be culpable if Hoover–Hankerson had one overarching scheme to distribute investigator vouchers to both Hoover and Hankerson to defraud the Superior Court, as opposed to separate schemes involving Hoover and Hankerson independently; if Hoover knew that the investigator voucher scheme was broader than the eleven vouchers that he had submitted; and if his submission of false investigator vouchers actively facilitated Hoover–Hankerson's overarching scheme. In that circumstance, Hoover could be responsible not only for the loss amounts attributable to the investigator vouchers submitted by him, but also for the loss amounts attributable to the investigator vouchers submitted by Hankerson. *See United States v. Cruz–Mercado,* 360 F.3d 30, 35 (1st Cir.2004) (affirming sentencing enhancement for $4.3 million in loss where defendant was only directly responsible for $600,000 on the basis that defendant was accountable for the full amount of loss of his coconspirator); *cf. United States v. Oseby,* 148 F.3d 1016, 1025–27 (requiring remand where the district court failed to make specific findings to attribute the amount of loss from coconspirators to the defendant for offense of conspiracy to defraud the United States). And, in that circumstance, it might be that the amounts converted by Hankerson and Hoover could be aggregated to reach the jurisdictional threshold. The government cites *United States v. Sanderson,* 966 F.2d 184 (6th Cir.1992), in support of its argument that amounts stolen through multiple conversions here were in the course of carrying

---

8. Although one who aids and abets need not know the details of the offense or even the identity of the principal, *United States v. Staten,* 581 F.2d 878, 887 (D.C.Cir.1978), there was no evidence to show that Hoover's activities actively facilitated those of Hankerson or furthered Hankerson's purposes.

out a single scheme and may be aggregated for the purposes of jurisdiction under § 666(a)(1)(A). While *Sanderson* notes that it is appropriate to aggregate amounts converted by a single defendant in the course of his own scheme, *Sanderson* does not address the propriety of aggregating amounts taken by separate individuals acting independently to reach the jurisdictional threshold on the substantive charge, and the government cites to no case which finds conviction under those circumstances appropriate.

Moreover, the government's evidence was insufficient to prove that Hoover–Hankerson had one overarching scheme dependent upon both Hoover and Hankerson (and not separate schemes with each independently), or that Hoover knew that any investigator fraud scheme involved more than his eleven fraudulent vouchers. *See, e.g., United States v. Sampol,* 636 F.2d 621, 676 (D.C.Cir.1980) (permitting aiding and abetting liability even if that defendant did "not perform the substantive offense, [did] not know its details, and [was] not even ... present, so long as the offense committed by the principal was in furtherance of the common design") (citations omitted); *cf. Wiley,* 846 F.2d at 155 (reversing conviction of defendant on aiding and abetting theory because there was insufficient evidence to show that he aided and abetted a large wire fraud scheme). Unlike the evidence supporting the convic-

tion for conspiring to commit witness voucher fraud, there is no evidence here from which the jurors could infer that Hoover thought Hoover–Hankerson engaged in a broader investigator voucher fraud scheme. While Taylor testified about Hoover–Hankerson, Hoover and Robinson meeting secretly before Taylor received his witness vouchers, and while the volume and number of individuals submitting witness vouchers bearing Hoover–Hankerson's signature is compelling, there is no equivalent evidence involving investigator vouchers.[9] *See Sampol,* 636 F.2d at 676 (noting that an accomplice may be liable for acts which are in furtherance of a common plan to commit a felony or are the natural and probable consequences of acts done in perpetrating the felony). It is equally plausible that Hoover–Hankerson aided and abetted Hoover and Hankerson independently, or that Hoover–Hankerson ran two separate investigator voucher schemes to defraud the Superior Court. Hoover submitted investigator vouchers on four dates which overlap only minimally with the more extended period of submissions by Hankerson. That limited coincidence hardly suffices to permit a reasonable inference that Hoover knew of and actively facilitated a broader investigator voucher fraud scheme reaching beyond him and Hoover–Hankerson to Hankerson such that Hankerson's thefts should be attributable to Hoover. The evidence against Hoover on Count 3 was insufficient

---

9. In *United States v. Webb,* a jury rendered a guilty verdict against a defendant on a § 666(a)(1)(A) charge where the jurisdictional amount was met only after aggregating the value of multiple conversions. 691 F.Supp. 1164, 1168 (N.D.Ill.1988). Because the court there had instructed the jury that it could convict if it "found that 'property valued at $5,000 or more' was 'embezzled, stole[n] or otherwise converted to the use of persons other than the rightful owners'—without finding that the thefts were part of a single plan[,]" the court noted that a jury could have

convicted without finding that a "single plan" supported its verdict. *Id.* In that case, though the "error ordinarily would require reversal of the guilty verdict," the government's additional charge of conspiracy to defraud the United States and the jury's finding of guilt on that conspiracy charge permitted the court to state that the jurors "necessarily found" that the thefts were part of a single scheme and uphold the conviction. *Id.* at 1168–69. Here, there was no charge and conviction of conspiracy to commit theft from the investigator voucher program.

to permit a rational trier to find beyond a reasonable doubt that Hoover was responsible for converting over $5,000 in investigator voucher funds. *See United States v. Ortiz*, 445 F.2d 1100, 1103 (10th Cir.1971) (noting that a conviction cannot be based on evidence that is consistent with both innocence and guilt).

## II. MOTION FOR A NEW TRIAL

■ Federal Rule of Criminal Procedure 33 provides that a motion for a new trial premised on grounds other than newly discovered evidence must be made "within 7 days after the verdict or finding of guilty, or within such further time as the court may fix during that 7–day period." "If the defendant fails to make a motion for a new trial within seven days and the court fails to 'fix' a new due date for the motion during that period, the court loses jurisdiction and cannot grant such a motion at a later time." *United States v. Marquez*, 291 F.3d 23, 25 (D.C.Cir.2002). "Rule 33 means what it says" and no court may entertain a motion for a new trial outside of the time limits set forth in Rule 33. *Id.*

Here, defense counsel timely preserved their right to move within seven days of guilty verdicts for judgments of acquittal by specifically invoking Rule 29. However, neither counsel asked for an extension of time to move for a new trial or mentioned Rule 33. Hoover's counsel unequivocally announced that his motion was made under the authority of Rule 29(c)(1). Despite being asked about other potentially relevant provisions of the Federal Rules of Criminal Procedure that contained a seven-day time limit, counsel did not invoke Rule 33 or request an extension to file a motion for a new trial.

■ Moreover, the circumstances here do not fall within the narrow "unique circumstances" exception to the jurisdictional time limits. A defendant may move for a new trial outside of Rule 33's strict time limits "only when the cause of the failure to meet the deadline was 'an erroneous ruling or assurance by the District Court itself.'" *Marquez*, 291 F.3d at 26 (quoting *Carlisle*, 517 U.S. at 428, 116 S.Ct. 1460). The parties never stated that the extension requested applied to any motion but one for judgment of acquittal. The court granted defendants an extension of the seven-day period to a fourteen-day period in which both defendants could file a post-verdict Rule 29 motion, and gave no indication that the ruling applied to any Rule 33 motion as well. Accordingly, defendants' motions for new trials must be denied because the court lacks jurisdiction to entertain them.

Even if the motions had been timely, defendants' grounds for a new trial appear meritless. Rule 33 provides that the trial court may, upon motion by the defendant "vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a); *see United States v. Williams*, 233 F.3d 592, 593 (D.C.Cir. 2000). A Rule 33 motion charging ineffective assistance of counsel must set forth evidence upon which the elements of a constitutionally deficient performance might properly be found. *United States v. Pinkney*, 543 F.2d 908, 915 (D.C.Cir.1976). Hoover argues that he deserves a new trial because he was denied the effective assistance of counsel when his motion to continue the trial was denied. Hoover claims the denial prevented him from obtaining witnesses that would corroborate the fact that other investigators worked for Hoover Investigations, Inc. However, in his motion for a continuance, Hoover mentioned no difficulties in obtaining such witnesses, and he now fails to identify who the witnesses are or how they would corroborate the fact that other investigators worked for Hoover

Investigations. *Cf. Poston,* 902 F.2d at 98 ("Mere assertions regarding the utility of prospective testimony do not provide a sufficient basis to compel a continuance [where] there is no indication that [the] testimony would have been material and favorable ...."); *Tabor v. United States,* 175 F.2d 553, 553 (4th Cir.1949) (denying motion for new trial based on absence of witnesses where the only proffered testimony would not have affected result). Similarly, Hoover–Hankerson argues that she was denied the aid of a handwriting expert and a financial expert by the denial of her motion to continue the trial. In her motion to continue, Hoover–Hankerson failed to articulate how specifically the purported missing witnesses would be helpful and fails to do so here as well. Moreover, neither defendant offers any explanation for why he or she could not secure these additional witnesses in the twelve months between the arraignments and trial.

Hoover also argues that his right to a fair trial was compromised when the court declined his request to poll a second time a juror who paused before acknowledging that he agreed with the verdicts announced by the foreperson. The court found that there was only a short delay before the juror answered, that his answer that the verdict was his verdict, albeit delayed, was nevertheless "unequivocal," and that there was no need "to especially call him out to voir dire him." [10] (Tr. of 7/8/04, afternoon session, at 10–11); *see United States v. O'Bryant,* 775 F.2d 1528, 1535–36 (11th Cir.1985) (finding no abuse of discretion in failing to repoll jurors when there was no expression of uncertainty).

Hoover–Hankerson moves for a new trial on several additional grounds. One is insufficiency of the evidence, specifically, that the government "did not show that [she] actually reached an agreement with any alleged coconspirator." (CHH Mot. at 9.) A new trial may be granted because of insufficiency of evidence only in "exceptional cases in which the evidence weighs heavily against the verdict." *Edmonds,* 765 F.Supp. at 1118. This is no such case, as the discussion above concerning the sufficiency of the evidence on the conspiracy count reveals. In addition, Hoover–Hankerson argues that the prosecutor made improper comments in his rebuttal argument by stating that the jury should "send a message that Ms. Hoover–Hankerson is not above the law." (CHH Mot. at 14.) The government disputes making the statement (Gov't Opp'n at 10 n. 9), and the transcript reveals that Hoover–Hankerson's allegation is inaccurate. While the government stated that "lawyers who take an oath to uphold the law and who have a special trust ... are not above the law" (Tr. of 7/7/04, afternoon session, at 59), the government made no mention that the jury should send a message to Hoover–Hankerson. Nevertheless, a new trial is not warranted if a prosecutor's statements are harmless. *See United States v. Johnson,* 231 F.3d 43, 48 (D.C.Cir.2000) (finding harmless prosecutor's statement asking the jury to convict the defendant to protect others from his drug dealing activities despite absence of curative instruction because the court gave general instructions to convict based only on the evidence and reminding jurors that lawyers' arguments are not evidence); *see also Gatling,* 96 F.3d at 1524 (finding that prosecutor's exhortation to the jury that it send a message to the defendant did not substantially

---

**10.** The poll had been completed forty minutes earlier. At the time of Hoover's request, the jury was waiting to be called back into court to receive supplemental instructions about deliberating over a forfeiture verdict.

prejudice the defendant given the court's instruction that closing arguments were not evidence). Here, whether the prosecutor's statements were proper or not, the court did instruct the jury that the lawyers' comments were not evidence.

Hoover–Hankerson also argues that the government delayed turning over certain financial documents but fails to identify how those documents prejudiced her case or impeded her ability to prepare a defense. *See United States v. Moseley,* 450 F.2d 506, 508–09 (5th Cir.1971) (affirming denial of motion for new trial based on government's failure to produce photographs which defense counsel knew about, but did not request, even though the photographs were subject to a pretrial discovery order).

Further, Hoover–Hankerson seeks a new trial claiming an inability to have participated meaningfully in voir dire because she could not see well during the voir dire process. Notwithstanding the fact that she never objected during the voir dire process professing any inability to see the proceedings, she was present during the entire proceedings, listened to the individual voir dire of veniremembers through a headset and engaged counsel in conversation during the voir dire process. She was by no means absent—or effectively absent—from the proceedings so as to merit a new trial. *Cf. United States v. Brest,* 23 F.R.D. 103, 106–07 (W.D.Pa.1958) (requiring new trial because no evidence established the defendant's presence when the jury was impaneled).

Hoover–Hankerson also asserts that the jurors had to wait a business day for her to appear for jury selection and that her appearance in a wheelchair had the potential to cause prejudice. The jurors were never made aware that the reason for the delay was Hoover–Hankerson's absence and she could not have been prejudiced for

that reason. Hoover–Hankerson cites to no case law to support her contention that her presence in a wheelchair caused her prejudice rather than brought her sympathy. In any event, she does not allege that any substantial rights were affected. *See United States v. Johnson,* 769 F.Supp. 389, 395–96 (D.D.C.1991), *rev'd on other grounds sub nom., United States v. Brawner,* No. 92–3208, 1996 WL 397478 (D.C.Cir. June 14, 1996).

### CONCLUSION AND ORDER

The government produced sufficient evidence to prove beyond a reasonable doubt that Hoover–Hankerson and Hoover were guilty of Counts 1, 2, 4, and 5, and that Hoover–Hankerson was guilty of Count 3. However, the government did not produce sufficient evidence to prove that Hoover was guilty of Count 3. Therefore, it is hereby

ORDERED that defendant Hoover–Hankerson's motions for judgment of acquittal and for a new trial be, and hereby are, DENIED. It is further

ORDERED that defendant Hoover's motion for judgment of acquittal as to Counts 1, 2, 4, and 5 and for a new trial be, and hereby is, DENIED. It is further

ORDERED that defendant Hoover's motion for judgment of acquittal as to Count 3 be, and hereby is, GRANTED. It is further

ORDERED that sentencing is scheduled for March 3, 2006 at 11:30 a.m. All supplemental sentencing memoranda must be filed by February 22, 2006. It is further

ORDERED that this matter be referred to the Probation Office for preparation of supplemental presentence investigation reports.